[Civ. No. 19022.   Second Dist., Div. Three.   Nov. 7, 1952.]

JOHN E. DOTY, Appellant, v. JOHN A. LACEY et al., Respondents.

Burum, Young & Wooldridge for Appellant.

Moss, Lyon & Dunn, Sidney A. Moss, Henry F. Walker, Crider, Runkle & Tilson and Elber H. Tilson for Respondents.

VALLÉE, J.—Appeal by plaintiff from a judgment for defendants entered on a directed verdict in an action for damages for personal injuries.

Viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to plaintiff, the facts are these.

Brown Drilling Company was the owner of oil field equipment which it wanted moved from Los Angeles County to Sacramento County. Plaintiff was an employee of Brown. Brown made an oral agreement with defendant Lacey by which Lacey agreed to furnish trucks and drivers, furnish a crane with an operator and an oiler (driver of the truck on which the crane was mounted) to load the equipment, and to truck it to its destination.

On the day moving was to begin, the trucks arrived at the location of the equipment under the supervision of Kennedy, truck foreman for Lacey. On the way to the location, the crane broke down. When it failed to arrive, Green, Brown's supervisor, called Hall, Lacey's superintendent, by telephone. Hall told Green the crane had broken down, and suggested he get a crane from defendant Wonderly Construction Company. Green said: "[A]ll right, to go ahead." Hall called Wonderly, asked if they had a crane available; they said they had, and Hall asked that it be sent to the location of the equipment with an operator and an oiler. The crane arrived with Winkler, operator of the crane, and an oiler, both employees of Wonderly. It was a mobile crane, mounted on a truck. The crane itself consisted of a cab with a boom running out from the base of the cab, the boom being four braced angle irons forming a box with lines running from the cab over the end of the boom and down to the objects to be moved. The crane was equipped with two sets of lines, one known as a "fast" line, which was used for lifting light loads, and the other a heavy line used for lifting heavier loads.

Brown had three crews of five men on the scene, each under the direction of its foreman, Tate. Plaintiff was a member of one of the crews. After several pieces of equipment were loaded, operations were begun to load a large piece of machinery, weighing about 18 tons, called a drawworks, onto a truck. The drawworks was in the middle of two subbases which formed the base of an oil derrick when the derrick was raised, thus making a floor out around the drawworks. The "fast" line was not in use. It was mounted on the boom, drawn up nearly to the end of the boom so that only a foot to one and a half feet of the line together with a hook thereon which weighed about 60 pounds extended from the end of the boom. The "fast" line was held in place by a brake. The operator of the crane had control of it and released it by pressure from his foot on the brake. The crane was backed into position near the drawworks. The boom was then lowered to a point about the center of the drawworks and lines were dropped to be hooked onto it.

The Brown crews, including plaintiff, were on the floor. They hooked the line to the drawworks, after which one of the men on the floor signaled Winkler to lift the load. As the load was brought to bear on the cable, the front wheels of the crane truck came off the ground two or three feet, letting the load down. As the wheels settled back, the drawworks raised about a foot and a half above the floor. Winkler continued to raise the boom, "the load overbalanced," and the drawworks swung over against the boom, denting it about 6 inches. Several of the Brown men, including plaintiff, had remained on the floor to work after the drawworks had been removed.

Shortly after the boom was damaged, Winkler motioned to Kennedy. Kennedy walked to within 3 feet of Winkler, who asked him to have Tate get his men off the floor. Kennedy, on the floor, hollered to Tate, who was some 75 feet away. There was evidence that there was much noise at the time. It was very difficult to hear; there was so much noise hand signals were usually used in the operation. Without waiting for Tate to reach the floor, and without waiting for all the men to get off the floor, Kennedy told Winkler "to go ahead or that it was all clear, or words to that effect."

Winkler then moved the drawworks off the floor by having the oiler move the truck. He then started to lower the load to the ground, and while doing so the boom broke and collapsed, causing the drawworks to fall to the ground. When the boom collapsed, the "fast" line with the sinker and the hook

attached to it, which had been hanging loose from the tip of the boom, swung out, whipped across the floor, struck plaintiff, knocking him to the floor and causing severe injuries.

The action is against Lacey and Wonderly. The motion of Wonderly for a directed verdict was granted on the ground Winkler was a fellow employee of plaintiff,—that is, Winkler and plaintiff were both employees of Brown; that plaintiff's injuries were caused by the negligence of his fellow employee; and that, therefore, the Industrial Accident Commission had sole jurisdiction. The motion of Lacey for a directed verdict was granted on the ground there was no proof of negligence on his part.

### The Case Against Wonderly

Plaintiff-appellant urges that there was sufficient evidence to support a finding by the jury that Winkler was the employee of Wonderly, an independent contractor, and not a special employee of Brown, as the trial judge concluded in granting the motion of Wonderly. Wonderly counters that it was not an independent contractor; that Winkler was Brown's employee, and that it is not liable under the doctrine of *respondeat superior*. The parties appear to agree there was sufficient evidence that Winkler was negligent to require submission of that question to the jury.

Labor Code, section 3353, defines an independent contractor as: ". . . any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished." We think there can be no question but that Wonderly was an independent contractor. (*California Emp. Com.* v. *Los Angeles etc. News Corp.*, 24 Cal.2d 421, 424 [150 P.2d 186]; *Anderson* v. *Badger*, 84 Cal.App.2d 736, 741 [191 P.2d 768]; *Preguica* v. *Industrial Acc. Com.*, 29 Cal.2d 857, 859 [179 P.2d 812].) The real question is whether there was evidence from which the jury could have concluded that Winkler remained an employee of Wonderly.

When an employer lends the services of an employee to a hirer for the operation of an instrumentality owned by the employer, together with the use of the instrumentality, without relinquishing to the hirer the power to discharge the employee, to go where and perform such work as the hirer directs, the legal inference is that, although the hirer directs the employee where to go and what to do in the performance

of the work, the employee as the operator of the instrumentality employed in doing the work, remains, in the absence of an agreement to the contrary, the employee of the employer alone insofar as the manner and method of operating the instrumentality is concerned, and the negligence of the employee is held to be that of the owner, and not that of the hirer of the instrumentality. (*Billig* v. *Southern Pac. Co.*, 189 Cal. 477, 485 [209 P. 241]; *Peters* v. *United Studios, Inc.*, 98 Cal. App. 373, 378-379 [277 P. 156]; *Scrimsher* v. *Reliance Rock Co.*, 116 Cal.App. 500, 504-505 [2 P.2d 862]; *Lowell* v. *Harris*, 24 Cal.App.2d 70, 76 [74 P.2d 551], Anno. 17 A.L.R.2d 1388.)

"In the absence of evidence to the contrary, there is an inference that the actor remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer. There is no inference that because the general employer has permitted a division of control, he has surrendered it." (1 Rest. Agency, 501, § 227.)

A general employer may lend his employee together with an instrumentality in such a manner as to render the person to whom the employee is loaned the special employer for the time being and hence relieve the general employer from liability for the employee's negligence in the operation of the instrumentality. But to escape liability, the general employer must relinquish full control of the employee for the time being, it not being sufficient that the employee is partially under the control of the third person; and it is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary cooperation where the work furnished is part of a larger operation. (*Peters* v. *United Studios, Inc.*, 98 Cal.App. 373, 379 [277 P. 156]; *Lowell* v. *Harris,* 24 Cal.App.2d 70, 76 [74 P.2d 551].)

"A continuation of the general employment is indicated by the facts that the general employer may at any time substitute another servant, that the time of employment is short, and that the lent servant has the skill of a specialist." (1 Rest., Agency, 501, § 227.)

Applying these rules, it is manifest that the evidence was such as to warrant the jury in concluding that Wonderly was an independent contractor; that Brown was not a special employer; and that Winkler was the employee of Wonderly and not of Brown. There was no evidence of release of authoritative control by Wonderly. There was no express agreement that Wonderly should relinquish to Brown complete

control over either Winkler or the crane. Wonderly did not confer on Brown the right to discharge Winkler. Brown, if dissatisfied with Winkler, might have asked Wonderly to provide another operator, but there was no power in Brown to discharge Winkler and put the crane under operative control of a man of its own. Wonderly might at any time have exercised its discretion and substituted some other operator in place of Winkler. The right of Brown—if it had such right—to tell Winkler what to load, when and where to go, the route to be taken in moving the crane,—did not give Brown any right of control of Winkler as to the manner and method of operating the crane. (*Moss* v. *Chronicle Pub. Co.,* 201 Cal. 610, 615 [258 P. 88, 55 A.L.R. 1258] ; *Entremont* v. *Whitsell,* 13 Cal.2d 290, 296 [89 P.2d 392] ; *Lowell* v. *Harris,* 24 Cal. App. 70, 79-81 [74 P.2d 551] ; 57 C.J.S. 284, § 566.) ▇ A direction to ''do anything they wanted to take care of'' does not necessarily indicate an intention by the general employer to surrender control of the employee. (*Umsted* v. *Schofield Eng. Const. Co.,* 203 Cal. 224, 229 [263 P. 799].)

It may fairly be inferred that Wonderly was to do the complete job of loading the equipment onto the trucks. Operation of a crane is a distinct operation requiring the services of a crane specialist. Control of the crane and its operation was entirely in Winkler. Winkler testified he was in complete charge of the operation of the crane; the only instructions he received from Brown were what pieces of equipment they wanted moved next, or if they disassembled a piece to tie onto it to keep it from falling to the ground; he determined where the crane was to be located for the purpose of lifting a load, whether a load was too heavy, and whether the crane was sitting properly to lift a load; anything to be done by the crane was done under his direction; that Kennedy, Lacey's superintendent, told him on which truck to place a piece of equipment. No one on behalf of Brown gave Winkler any instructions in regard to the operation of the crane, or the manner in which the work done by the crane was to be performed, or as to keeping it in working order. Even though Winkler lifted equipment onto trucks for Brown, yet in the operation of Wonderly's crane Winkler was still doing just what Wonderly employed him to do, operate the crane. ▇ The giving of signals to Winkler was not the giving of orders, but of information; and obedience of the signals shows cooperation rather than subordination, and is not sufficient to

show there has been a change of employer. (*Standard Oil Co. v. Anderson*, 212 U.S. 215 [29 S.Ct. 252, 53 L.Ed. 480].)

The services to be rendered by Winkler were for this one job, not for an indefinite period. Brown was not in the business of operating cranes. It did not move its own equipment when moving was necessary, but usually hired Lacey to load, move, and unload it. Operating a crane requires technical skill on the part of the operator—a fact which the jury might have considered as making it inconceivable that the parties intended that Brown was to direct a specialist in a field in which it would have been wholly incompetent.

Wonderly paid Winkler for his services, not Brown. Wonderly billed Lacey for the use of the crane and the services of Winkler and the oiler. Lacey, in turn, billed Brown. Wonderly furnished the oil and gas for the crane and the truck on which it was mounted. It may fairly be inferred that Brown did not think Winkler was its employee, and that Winkler did not think Brown was his employer.

The jury might well have concluded that none of the indicia of the right of control by Brown was present. It could have found that Winkler remained in the exclusive employ of Wonderly at all times and that Brown not only had no right to control him in the manner he performed his work but, in fact, did not assert any such right, nor seek to direct him other than to point out to him the equipment to be loaded onto trucks.

On facts substantially similar to those in the present case, it has been held, as a matter of law, that the loaned employee remained the servant of the general employer. (*Billig* v. *Southern Pac. Co.,* 189 Cal. 477 [209 P. 241]; *Preo* v. *Roed,* 99 Cal.App. 372, 375-379 [278 P. 928]; *Pire* v. *Gladding Mc-Bean & Co.,* 55 Cal.App.2d 108, 113-114 [130 P.2d 143]; *Clarke* v. *Hernandez,* 79 Cal.App.2d 414 [179 P.2d 834].)

Since it could reasonably have been concluded that Winkler remained the employee of Wonderly and did not become the employee of Brown, the question should have been left to the jury under appropriate instructions. (*Umsted* v. *Scofield Eng. Const. Co.,* 203 Cal. 224 [263 P. 799]; *Burns* v. *Jackson,* 59 Cal.App. 662 [211 P. 821]; *Peters* v. *United Studios, Inc.,* 98 Cal.App. 373 [277 P. 156]; *Valdick* v. *LeClair,* 106 Cal.App. 489 [289 P. 673]; *Scrimsher* v. *Reliance Rock Co.,* 116 Cal.App. 500 [2 P.2d 862]; *Madsen* v. *LeClair,* 125 Cal.App. 393 [13 P.2d 939]; *Hilliard* v. *Fabricius,* 10 Cal. App.2d 348, 352 [51 P.2d 1134]; *Lowell* v. *Harris,* 24 Cal. App.2d 70 [74 P.2d 551]; *Anderson* v. *Abramson,* 234 Iowa

792 [13 N.W.2d 315, 318] ; *American Tel. & Tel. Co.* v. *Ohio Valley Sand Co.,* 131 W.Va. 736 [50 S.E.2d 884] ; *Bellantoni* v *Thomas & Buckley Hoisting Co.,* 203 App.Div. 412 [196 N.Y.S. 667].)

We hold that the court erred in granting the motion of Wonderly for a directed verdict.

### The Case Against Lacey

■ The motion for a directed verdict in favor of Lacey was granted on the ground there was no proof he was negligent. Plaintiff urges the evidence was such as to compel submission of his case against Lacey to the jury. He says that apart from the negligence of Winkler, there was independent evidence Lacey was negligent. We are of the opinion this contention must be sustained. Kennedy was Lacey's truck foreman, "pusher," on the job. After the boom had been damaged Winkler motioned to Kennedy. Kennedy walked to within 3 feet of Winkler. Winkler asked him to have Tate get his men, including plaintiff, off the floor. Tate was some 75 feet away. Kennedy hollered to Tate "that Winkler had put a kink into his boom, and advised him to remove all his men off the floor in case of danger, or something to that effect." Kennedy heard Tate say something to the men, but not what he said. Several men "scattered" off the floor, but not all of them ; plaintiff and one or two others did not leave the floor. There was much noise at the time, so much that hand signals were usually used in the operation. It was very difficult to hear. Kennedy himself did not make any attempt to warn the men to get off the floor. Without waiting for Tate to reach the floor, and without waiting for all the men to get off the floor, Kennedy told Winkler "to go ahead or that it was all clear, or words to that effect." Kennedy testified he knew when he gave the signal there were men still on the floor, and that Winkler could not see plaintiff because of the size of the drawworks. Winkler then moved the drawworks and the boom collapsed. This evidence was sufficient to compel submission to the jury of the question whether Kennedy exercised due care in signaling Winkler to proceed before the floor was clear, and whether, if he failed to exercise due care, such failure was a proximate cause of the injuries sustained by plaintiff. The court erred in granting the motion of Lacey for a directed verdict.

Reversed.

Shinn, P. J., and Wood (Parker), J., concurred.