Filed 4/7/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| BONNIE DUCKSWORTH et al., | B294872 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC676917) |
| v. | |
| TRI-MODAL DISTRIBUTION SERVICES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lia Martin, Judge. Affirmed.

Lipeles Law Group, Kevin A. Lipeles, Thomas H. Schelly, and Julian Bellenghi for Plaintiffs and Appellants.

Larson & Gaston, Daniel K. Gaston, and Gloria G. Medel for Defendants and Respondents Scotts Labor Leasing Company, Inc. and Pacific Leasing, Inc.

Lewis Brisbois Bisgaard & Smith, Jack E. Jimenez, Lann G. McIntyre, and Tracy D. Forbath for Defendant and Respondent Mike Kelso.

————————————

Bonnie Ducksworth and Pamela Pollock are customer service representatives at Tri-Modal Distribution Services. Tri-Modal promoted others but, for decades, never promoted them. Ducksworth and Pollock believed this was due to discrimination against African-Americans. They sued.

In addition to her discrimination claim, Pollock also sued about sexual harassment. Tri-Modal's executive vice president Mike Kelso began "a dating relationship" with Pollock. Pollock refused Kelso's request to make the relationship more sexual. Pollock ultimately ended the relationship. After she dumped him, Kelso blocked her promotions at Tri-Modal, Pollock alleged.

These contentions implicated employer Tri-Modal, but it is not involved in this appeal. Rather three different defendants are our sole concern, as follows.

Two of these other defendants are two staffing agencies called Scotts Labor Leasing Company, Inc., and Pacific Leasing, Inc. Scotts and Pacific supplied employees, including Ducksworth and Pollock, to Tri-Modal. The trial court granted summary judgment for Scotts and Pacific because they were uninvolved in Tri-Modal's decisionmaking about whom to promote. We affirm this ruling for the staffing agencies.

The third defendant is Kelso. The trial court granted a separate summary judgment for Kelso because the statute of limitations barred Pollock's claim against him. Pollock appeals this ruling on two grounds. First, she says the court erred at summary judgment in overruling her hearsay objection to a key part of Kelso's evidence. Second, she argues the court miscalculated the statute of limitations by running the clock from the date the employer *offered* a competitor the promotion and the competitor *accepted* the promotion rather than the later date when the competitor *began working* at the new position. We affirm this summary judgment ruling for Kelso.

I

Five of the key actors are Ducksworth, Pollock, Tri-Modal, Scotts, and Pacific. (The appellate briefs and record do not spell Pollock's name consistently. We use the spelling that is more common in the papers.)

2

In the first cause of action, Ducksworth and Pollock sued Scotts, Pacific, and Tri-Modal for racial discrimination under subdivision (a) of Government Code section 12940, which is part of California's Fair Employment and Housing Act. Some call this statute FEHA. We refer to it as the Act.

Ducksworth's and Pollock's theory was racial discrimination explained why they have never been promoted.

What is Tri-Modal? It describes itself as a transportation logistics, warehousing, and distribution services company, while Ducksworth and Pollock call it simply a trucking company. Gregory Owen owns Tri-Modal. Kelso has been its executive vice president since 2009.

Scotts and Pacific are companies engaged in what the parties call "labor leasing." These two companies provide Tri-Modal, and only Tri-Modal, with staffing and administrative services for leased employees, including Ducksworth and Pollock.

The parties do not use the same terminology to refer to Scotts and Pacific. These companies describe themselves as "professional employer organizations i.e. employment leasing/staffing companies." Ducksworth and Pollock disputed this description and instead, in their pleading, called them "staffing agencies." No party explains to us what difference labeling might make, so we use the shorter "staffing agencies." (Cf. *Jimenez v. U.S. Continental Marketing, Inc.* (2019) 41 Cal.App.5th 189, 192, fn. 2 [nomenclature about temporary staffing entities varies in case law].)

Ducksworth applied through Scotts for an open position with Tri-Modal in 1996. Scotts hired her that year and leased her to Tri-Modal from 1996 to 2006.

Similarly, the following year, in 1997, Pollock applied for a position with Tri-Modal through Scotts. Scotts hired her and leased her to Tri-Modal from 1997 to 2006.

Both Ducksworth and Pollock worked continuously at Tri-Modal from their start dates through the time of summary judgment, which was in late 2018. In 2006, however, after a two-week interlude by a third staffing company not involved here, Pacific took over the role Scotts formerly

performed regarding Ducksworth and Pollock. Pacific provides the same services to Tri-Modal as did Scotts.

For Ducksworth and Pollock and similar employees leased to Tri-Modal, Scotts and Pacific tracked and processed payroll, health insurance, workers compensation, vacation, holiday, sick pay, tax, and social security payments. The name on these employees' paychecks was either Scotts or Pacific.

Tom Scott formed Scotts in 1996 when he closed down another company called Marine Glass Company, was unemployed, and then spoke with Greg Owen, whom Scott knew. Scott formed Pacific in 1997.

Scotts and Pacific provide their services only to Tri-Modal and not for any other company. Tom and Sheri (or Cheri—we thus refer to her as Ms. Scott) Scott are married and are the sole owners of Scotts and Pacific. Ms. Scott works at Tri-Modal one and a half to two hours a week. Her work is to pay truck drivers.

At the time of Tom Scott's deposition, 44 people worked at Scotts and nine worked at Pacific. All were leased to Tri-Modal. Up to and ending in 2006, Scotts leased Ducksworth and Pollock to Tri-Modal. At the time of Scott's deposition, it was Pacific that leased Pollock and Ducksworth to Tri-Modal. Tom Scott considered both Pollock and Ducksworth to be employees of Pacific because "our name is on their paycheck." In addition to these people, Tom Scott himself (but not Ms. Scott) is an employee of Scotts.

Tom Scott testified that he is not employed by Tri-Modal, but that Scotts leases him, Tom Scott, to Tri-Modal, where he has been compliance safety director continuously since 1998. This compliance safety work involves running background checks on drivers, orienting and training drivers, maintaining their qualification files, and such. Tom Scott supervises no one. Tom Scott's paycheck comes from Scotts Labor Leasing.

Tom Scott, Scotts, and Pacific were not involved with the day-to-day supervision of Ducksworth and Pollock at Tri-Modal. Tom Scott knew Pollock "is a clerk of some type" at Tri-Modal, and he knew Ducksworth is "in the customer service department" there. But Tri-Modal rather than Scotts or Pacific set work schedules for Ducksworth and Pollock. Pollock would go to

4

Tri-Modal, not Scotts or Pacific, for work assignments or if she were running late or asking for a day off.

The decision to give a raise to any employee leased by Scotts or Pacific to Tri-Modal was made solely by Tri-Modal, with no input from Scotts or Pacific.

Ducksworth and Pollock rarely interacted with Scotts and Pacific. Pollock did not interact with Tom Scott on a daily basis and did not see him on a monthly or weekly basis. Ducksworth would not see Tom Scott during the course of a week, except perhaps to say "hi" if they did happen to see each other. If Pollock had any interaction with Tom Scott, it would be about insurance or benefits.

Pollock never went to Scotts about a work related complaint, but instead would take it to Tri-Modal. Pollock never discussed raises or promotions with Tom Scott. Similarly, Ducksworth never went to Scotts to request a raise or promotion. Scotts had no input about raises or promotions at Tri-Modal.

Tom Scott never disciplined Pollock or Ducksworth during their employment. Scotts never supervised or trained Pollock or Ducksworth.

Scotts and Pacific moved for summary judgment.

The following quotation is from Fact 16 in the separate statement for this summary judgment motion.

"The decision to promote an employee leased to by [*sic*] Scotts or Pacific to Tri-Modal is made solely by Tri-Modal. Scotts or Pacific do not provide any input, have any authority or make any decision regarding the promotion of any employees leased to Tri-Modal."

Ducksworth and Pollock told the trial court they did not dispute Fact 16.

On December 6, 2018, the trial court found the undisputed Fact 16 entitled the staffing agencies to summary judgment.

We now recount some facts about Pollock and Kelso in particular.

Kelso began dating Pollock in 2014. The relationship involved passionate kissing. Kelso wanted sexual intercourse but Pollock did not, according to Pollock. Pollock ended the relationship in 2016. In the second cause of action, Pollock and not Ducksworth sued Kelso and Tri-Modal for

quid pro quo sexual harassment in violation of subdivisions (j)(1) and (j)(3) of Government Code section 12940, which is part of the Act.

On November 20, 2018, the trial court granted summary judgment for Kelso based on the statute of limitations.

Ducksworth and Pollock appealed the summary judgments in favor of Scotts, Pacific, and Kelso.

II

In this section, we review the summary judgment in favor of the staffing agencies. The trial court ruled undisputed Fact 16 exonerated the staffing agencies according to the governing precedent of *Bradley v. Dept. of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1628–1629 (*Bradley*). The trial court was right. Scotts and Pacific basically were innocent bystanders in this case of alleged discrimination by Tri-Modal. We affirm because Scotts and Pacific were not involved with the promotions Ducksworth and Pollock attack. A company that has not discriminated cannot be liable for discrimination.

As the trial court ruled, *Bradley* is the leading precedent on the pertinent issue. (See *Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 499 [Supreme Court majority cites *Bradley*]; *id.* at pp. 504 & 507 [Supreme Court dissent also cites *Bradley*]; *Martinez v. Combs* (2010) 49 Cal.4th 35, 50, fn. 16 [citing *Bradley*]; *State ex rel. Dept. of California Highway Patrol v. Superior Court* (2015) 60 Cal.4th 1002, 1008, fn. 2 [citing *Bradley*].)

*Bradley* held an employee can sue its "contracting employer," like Tri-Modal in this case, without suing the employee's "staffing agency." (*Bradley*, *supra*, 158 Cal.App.4th at p. 1629.) In *Bradley*, a worker named Sallie Mae Bradley at a state prison brought sexual harassment and retaliation claims against the California Department of Corrections and Rehabilitation—the "department"—under Government Code section 12940. (*Id.* at p. 1617.) Bradley proved a prison chaplain sexually harassed her, and then the prison fired *her* when she complained. (*Id.* at pp. 1618–1623.)

Bradley had a contract with a staffing agency, which in turn had a contract with the department for Bradley to work at the prison. (*Bradley*, *supra*, 58 Cal.App.4th at p. 1618.) We use the term "staffing agency" while the court in *Bradley* used the label "temporary service agency" to describe the

entity tracking Bradley's hours and issuing her paychecks. (*Id.* at p. 1624.) Bradley sued the department and not the staffing agency. (*Id.* at pp. 1617–1618.)

The *Bradley* decision discussed a California state regulation issued by the Fair Employment and Housing Commission, which is the agency charged with interpreting Government Code section 12940. (*Bradley*, *supra*, 158 Cal.App.4th at p. 1629.)

This regulation specifies "[a]n individual compensated by a temporary service agency for work to be performed for an employer contracting with the temporary service agency is an employee of that employer for such terms, conditions and privileges of employment under the control of that employer. Such an individual also *is an employee of the temporary service agency with regard to such terms, conditions and privileges of employment under the control of the temporary service agency*." (Cal. Code Regs., tit. 2, § 11008, subd. (c)(5), italics added [definition previously in Cal. Code Regs., tit. 2, § 7286.5, subd. (b)(5)].)

The *Bradley* decision rejected the department's argument that, under this governing regulation, the staffing agency had to be liable for the prison chaplain's misconduct. (*Bradley*, *supra*, 158 Cal.App.4th at pp. 1628–1629.) The staffing agency was not an indispensable party to Bradley's suit because there were no allegations in the complaint and no evidence to suggest liability rested on *terms, conditions, or privileges of employment under the control of the staffing agency*. To the contrary, all allegations related to matters under the department's control. (*Id.* at p. 1629.)

In short, *Bradley* held the staffing company was not liable for harassment with which it was entirely uninvolved. (Cf. *Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1180, 1182–1184 [a temporary employment agency can be liable for harassment at a client's workplace if employee is required to, and does, report problems at the client's workplace to the agency].)

The trial court here properly applied the regulation and reasoning in *Bradley* to Scotts and Pacific. Undisputed Fact 16 conclusively established Scotts and Pacific did "not provide any input, have any authority or make any decision regarding the promotion of any employees leased to Tri-Modal."

7

Under *Bradley*, Scotts and Pacific were not involved and are not liable and thus are out of the suit.

The *Bradley* decision makes good sense to us. Ducksworth and Pollock do not criticize it as wrongly decided.

Rather Ducksworth and Pollock make a passing effort to distinguish *Bradley*, but their opening brief confines their effort to a short paragraph. This paragraph asserts their case differs from *Bradley* "in two respects."

Neither proposed distinction has force.

Ducksworth's and Pollock's first proposed distinction fails. It consists of one sentence, which is their *complaint* "attributes liability" to the staffing company. Evidence, however, eclipses mere pleading allegations, and here, according to Fact 16, undisputedly "[t]he decision to promote an employee leased to by [*sic*] Scotts or Pacific to Tri-Modal is made solely by Tri-Modal. Scotts or Pacific do not provide any input, have any authority or make any decision regarding the promotion of any employees leased to Tri-Modal." This undisputed fact overwhelms and refutes the allegations in their complaint. This first attempt to distinguish *Bradley* is unsuccessful.

Ducksworth's and Pollock's second proposed distinction builds on two other facts: the fact the staffing agencies' employee handbook guaranteed equal opportunity and freedom from harassment, and the fact the staffing agencies' president Tom Scott attended a meeting Tri-Modal called to address Pollock's allegations. Were it not for Fact 16, these two other facts might create inferences about whether the staffing agencies had input, authority, and decisionmaking power over promotions at Tri-Modal. But Fact 16 settled the issue because Ducksworth and Pollock agreed Fact 16 was undisputed. That agreement trumped contrary inferences.

Fact 16 is paramount and conclusive in this case. The point of a separate statement in the summary judgment process is to identify and to isolate factual issues and thus to facilitate decisionmaking by trial judges. The summary judgment process itself is highly desirable. The separate statement is one of its core features. This process, vital to everyday life in the trial courts, would break down entirely if parties were free to walk away from or to adjust the separate statement once they discovered the court's legal analysis was not going their way.

8

Because Ducksworth and Pollock cannot distinguish *Bradley*, that sound case validates the trial court's decision regarding the staffing agencies. The court correctly granted summary judgment for Scotts and Pacific because they were not involved in the Tri-Modal decisions Ducksworth and Pollock would condemn.

### III

We now turn to Kelso, Tri-Modal's executive vice president. He moved for summary judgment because the statute of limitations barred Pollock's claims. The trial court correctly granted Kelso's motion.

The claim against Kelso involved Pollock and not Ducksworth because Kelso had a dating relationship only with Pollock. Ducksworth does not figure in this aspect of the case.

Pollock's theory in her second cause of action was Kelso began to date her, but then wanted their relationship to be more sexual. Pollock did not want that. Kelso also insulted her with remarks about "collard greens." Pollock ended the dating relationship, and then Kelso and thus Tri-Modal punished Pollock by denying her promotions at Tri-Modal she deserved and by instead promoting five other employees less qualified than Pollock.

The trial court's analysis of the statute of limitation issue was as follows. Pollock filed her sexual harassment complaint with the Department of Fair Employment and Housing on April 18, 2018. So the one-year clock began to run for Pollock on April 18, 2017. The court ruled, however, Kelso established the events about which Pollock complained—the promotion of the five others over her—either did not occur at all, or else occured before April 18, 2017. These facts, and particularly the precise dates of the various promotions, were vital in the court's analysis.

We return to the precision of these dates in just a moment, for they play a prominent role in a hearsay issue we tackle.

Pollock objected to the source of these facts and dates. This source of evidence was the "Mullaney declaration." The court overruled Pollock's evidentiary objections to the Mullaney declaration.

On appeal, Pollock makes two arguments about the statute of limitations: the trial court improperly overruled Pollock's hearsay objection to the Mullaney declaration, and the court miscalculated the statute of

limitations by selecting the wrong date on which to start the clock. Both arguments err. We take up each in turn.

A

We start with Pollock's hearsay argument. Pollock objected to the Mullaney declaration, which Kelso offered to support his motion for summary judgment. The trial court overruled the objection. This ruling was not an abuse of discretion.

1

We add more facts for context.

Pollock's theory in her second cause of action was, because of sexual harassment, Kelso and Tri-Modal promoted five specific employees instead of her. In response, Kelso offered evidence about whether and when Tri-Modal did promote those five other employees. Kelso claimed, for one of these five people, there was no promotion at all, and for the other four people, their promotions were so long ago as to create a time bar blocking Pollock's claim against Kelso.

Kelso's source for his factual assertions about these promotions was a declaration from Tri-Modal's vice president of operations, Timothy Mullaney. The hearsay dispute is entirely about Mullaney's declaration.

We summarize Mullaney's declaration. As we do, bear in mind the key limitations date is April 18, 2017: complaints about actions before that date would be time-barred and would dictate victory for Kelso.

Mullaney began his declaration by swearing he had personal knowledge of everything in the declaration. He then declared he had been Tri-Modal's vice president of operations since 2009. In that role, Mullaney supported managers who were the ones making final hiring and promotion decisions. He sometimes provided recommendations. And he "open[ed] positions to be filled." Mullaney did not specify what it meant to "open positions." Mullaney also had access to employee personnel files, and he had reviewed some of those files.

Mullaney next stated specific facts and dates about the five promotions Pollock challenged. The point of these specific facts and dates was to establish the basis for Kelso's two key defenses: (1) that Tri-Modal had not

10

promoted one of the five employees at all, and (2) that the promotions of the other four triggered clocks barring Pollock's harassment claim as tardy.

Mullaney declared Tri-Modal never promoted the first of these five employees at all.

Mullaney then gave specifics about the promotion dates for the other four employees.

According to Mullaney, Tri-Modal did not promote the second and third employees into supervisory positions on or after July 19, 2016, and did not promote the fourth employee on or after April 18, 2017. The company offered the fifth employee—one Leticia Gonzalez, to whom we shall return—a promotion in March 2017. Gonzalez's promotion "t[oo]k effect" May 1, 2017.

(The difference between these two dates for Gonzalez—March 2017 versus May 1, 2017—created an issue we address shortly. Recall the limitations date of April 18, 2017, which falls in between these dates and which animates the issue to which we return below.)

In sum, Mullaney's specific facts were essential for Kelso's defense about the statute of limitation. On the basis of these facts, Kelso maintained Mullaney's declaration showed Pollock's suit was misguided and untimely.

In response, Pollock raised a hearsay objection to Mullaney's declaration. She said Mullaney's testimony was hearsay because its source was not Mullaney's personal knowledge but rather came from his reading of personnel files, which were out-of-court documents, were not in evidence, and were nothing but hearsay.

The trial court overruled Pollock's hearsay objection. On appeal, Pollock renews this objection.

2

We must determine the standard of review for this hearsay issue. There is controversy here.

In *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 (*Reid*), the Supreme Court approved of independent review when the trial court entirely *failed to rule* on evidentiary objections in connection with a summary judgment motion. But what about when the trial court *has* made an evidentiary ruling, as here? *Reid* declined to decide that question. (*Ibid.*)

11

The vast majority of courts of appeal since *Reid* have applied the abuse of discretion standard in this situation.  (See, e.g., *Schmidt v. Citibank, N.A.* (2018) 28 Cal.App.5th 1109, 1118; *Pacific Gas and Electric Co. v. Superior Court* (2018) 24 Cal.App.5th 1150, 1169; *Duarte v. Pacific Specialty Ins. Co.* (2017) 13 Cal.App.5th 45, 52;  *O'Neal v. Stanislaus County Employees' Retirement Assn.* (2017) 8 Cal.App.5th 1184, 1198–1199; *Ryder v. Lightstorm Entertainment, Inc.* (2016) 246 Cal.App.4th 1064, 1072; *Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 951; *Serri v. Santa Clara Univ.* (2014) 226 Cal.App.4th 830, 852; *Ahn v. Kumho Tire U.S.A., Inc.* (2014) 223 Cal.App.4th 133, 143–144; *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 181; cf. *Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1122–1123 (conc. opn. of Turner, P. J.) (*Howard*) [listing 13 decisions and stating the "unanimous" decisions from 2006 to 2012 applied abuse of discretion standard].)

Apparently two courts have disagreed.  (See *Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1450–1452 [interpreting "*Reid's* practical effect" to mandate independent review]; *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 226 [standard of review varies depending on the type of evidentiary objection].)

We join with the vast majority and its embrace of abuse of discretion as the proper standard.  The weight of this massed authority is impressive.

The logic supporting this mass view also is impressive.  Experienced trial judges tend to agree, first, evidence law is surpassingly intricate and, second, the need for dispatch is pressing.  Moreover, a single summary judgment motion can bring with it hundreds of written objections.  (E.g., *Cohen v. Kabbalah Centre Internat., Inc.* (2019) 35 Cal.App.5th 13, 20 [197 written objections in one summary judgment motion].)  In trial, too, a judge may have to rule on dozens of objections per hour, hour after hour, day after day, week after week.  Each objection commonly contains within it many different grounds:  foundation, relevance, 352, hearsay, and so forth.  Each ground calls for a different evidentiary analysis.  And lawyers can, and do, make evidentiary objections entirely at will.  Few *and perhaps none* of these evidentiary objections may be of any ultimate importance.  (See *id.* at pp. 20–21.)

12

Because of the daunting complexity, volume, and pace of this decisionmaking task, the latitude implied by the abuse-of-discretion standard thus does make "great sense." (*Howard*, *supra*, 208 Cal.App.4th at p. 1123 (conc. opn. of Turner, P. J.).)

We thus review the trial court's hearsay ruling to see if the court abused its discretion.

3

The court did not abuse its discretion by overruling Pollock's hearsay objection.

The hearsay question in this case was a close call. Mullaney recited a series of promotion dates. He said certain employees were not promoted "on or after" specific dates and said Gonzalez was promoted in March 2017. One wonders: was Mullaney just reading and reciting those dates off documents in personnel files? If so, that *would* be hearsay, unless the declaration established some proper way around the hearsay rule, which it did not. (Cf. Evid. Code § 1271 [reciting four foundational facts to establish the business records exception].) Or was Mullaney reciting this series of dates *from personal knowledge*, thus avoiding the hearsay problem?

Under an abuse of discretion standard, we could affirm whichever ruling the trial court might make in this factual situation. The facts were in equipoise. We illustrate.

It would have been reasonable for the court to conclude there was a fatal hearsay problem, because paragraph nine of Mullaney's declaration stated "I have reviewed the personnel files" of the five employees. Immediately after that, in paragraphs 10 through 18, Mullaney recounted the crucial dates. This close sequence of assertions could support a reasonable inference Mullaney merely read the dates from the files: "I looked at the personnel files. The promotion dates were before X date or were in Y month." The immediacy with which sentence two follows sentence one is context. That context could support the inference Mullaney knew the promotions were before X date or were in Y month because he just read those dates from the files. That recitation from documents would be merely hearsay, unless there were a valid exception, which the declaration did not establish.

13

But the opposite ruling also would have been reasonable. The trial court fairly could have ruled as it did: to overrule Pollock's hearsay objection to Mullaney's declaration. Mullaney did establish a plausible basis for his own personal knowledge of these dates. Mullaney was at Tri-Modal the whole time and was deeply involved in Tri-Modal's personnel process. The first paragraph of Mullaney's declaration asserted he had "personal knowledge of each of the facts set forth herein . . . ." The trial judge did not abuse her discretion by accepting that statement at face value in this context.

Under the abuse of discretion standard, when more than one inference reasonably can be deduced from the facts, we will not substitute our deductions for those of the trial court. (*In re Marriage of Rothrock* (2008) 159 Cal.App.4th 223, 230.) The trial court's admission of the Mullaney declaration thus was not an abuse of discretion.

There is a lesson here for litigators: know your Evidence Code when working with declarations. It was risky business to omit the foundation for the business records exception in Mullaney's declaration. Adding that foundation probably would have taken little effort. Why walk so near the cliff's edge when the view is just as fine at a safer distance?

4

In sum, the trial court properly admitted the Mullaney declaration. Kelso could use the declaration to support his motion for summary judgment.

B

We now address the second part of Pollock's argument about the statute of limitations. This argument requires a legal choice between two dates. Tri-Modal gave Leticia Gonzalez a promotion in March 2017, but Gonzalez did not start work in this new role until May 1, 2017. Which date should trigger the clock: when Tri-Modal *offered* and Gonzalez *accepted* the promotion, or when she *started* the new job? The interval in between straddles the limitations start date, so the earlier date means victory for Kelso, while the later date means victory here for Pollock.

The trial court used the earlier date, which was the date Gonzalez was *offered and accepted* the position over Pollock. Pollock maintains the limitations period began to run only later, when the other employee's promotion *took effect*. The trial court was right. Pollock's claims were barred.

14

We independently review this question of law. (*Sahadi v. Scheaffer* (2007) 155 Cal.App.4th 704, 713–714.)

By law, Kelso is right. The statute of limitations for a failure to promote runs from when the employer tells employees they have been given (or denied) a promotion. That date is key, and not the date when the promoted worker actually starts the new work.

This result follows as a matter of statutory interpretation, so we turn our gaze to the precise statutory language.

The governing statutes are sections 12940 and 12960 of the Government Code. All statutory citations are to this code.

Subdivision (j)(1) of section 12940 makes it illegal for an employer to "harass" employees on account of sex and gender. And, as pertains to Pollock's suit, former subdivision (d), now subdivision (e), of section 12960 set a one-year clock for complaints about harassment. (The statute changed effective January 1, 2020, but that change is not pertinent here.)

The governing statutory language used the key word "occurred": "No complaint may be filed after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate *occurred*." (Gov. Code § 12960, former subd. (d), italics added.)

In this case, the alleged quid pro quo sexual harassment "occurred" when Kelso supposedly punished Pollock at work for refusing his demand to make their relationship more sexual.

Logically and thus textually, an employer injures the employee by denying a deserved promotion as an instrument of sexual harassment. That moment "occurred" when Tri-Modal allegedly did not promote the deserving Pollock because of sexual harassment. That was in March 2017. So Pollock's injury "occurred" in March 2017, according to the plain meaning of the word "occurred."

This definition of "occurred" is simple and straightforward and thus desirable and correct.

We can double-check this analysis with a hypothetical example. Pollock's allegation is Kelso offered the promotion to Gonzalez instead of Pollock in retribution for Pollock's refusal to submit to Kelso's demand to make their relationship more sexual. For purposes of analysis, suppose Kelso

15

had been candid about his allegedly harassing decision.  In this hypothetical, Kelso would tell Pollock, "Today I am giving this promotion to someone else, even though you deserve it, because you rejected my sexual advances."  Such a candid admission would describe grossly illegal discrimination that "occurred" in March 2017, when Kelso denied Pollock a benefit she deserved because Kelso wanted sex from her and she would not give it.  So that date triggered the one-year clock.  That Kelso allegedly was less than candid would not change anything fundamental about this analysis.

Pollock argues for a contrary conclusion based on her misunderstanding of the *Romano* decision.  (See *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479 (*Romano*).)

*Romano* construed a different statutory word:  "discharge."  *Romano* held, essentially, that discharge occurs when you are off the payroll.  (*Romano*, *supra*, 14 Cal.4th at pp. 491–500.)  That simple holding seems obviously correct and is binding law but has nothing to do with this case, which does not involve a discharge.  *Romano* thus does not govern here.

The trial court correctly concluded that Government Code section 12960, former subdivision (d) bars Pollock's claims because she did not file her administrative complaint within one year of March 2017, the time that those claims accrued.  Summary judgment on this ground was proper.

## DISPOSITION

We affirm and award costs to Scotts, Pacific, and Kelso.


WILEY, J.


We concur:



BIGELOW, P. J.              GRIMES, J.


16